Frank MAXEY and Mary Amanda Maxey, Individually and as next friends of Mary Kathryn Maxey and Carroll Kaylene Maxey, minors

v.

FRIEGHTLINER CORPORATION.

Civ. A. No. CA–3–76–1204–G.

United States District Court,
N. D. Texas,
Dallas Division.

April 21, 1978.

Foster Reese, III and Windle Turley, Dallas, Tex., for plaintiff.

Thomas G. Nash, Jr., Elliott, Churchill, Hensen, Dyess & Maxfield, and Royal H. Brin, Jr., Strasburger & Price, Dallas, Tex., for defendant.

## OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

On November 21, 1974, in Comanche, Texas, Billy Carroll Maxey and Mary Delia Maxey were burned alive in the cab of a truck manufactured by defendant Freightliner Corporation. The large diesel powered truck tilted on its side and slid approximately 288 feet to a stop, without forcefully colliding with any objects. The fatal fire erupted after the truck came to a stop. Bill's and Mary's death orphaned Mary Kathryn Maxey, age 12, and Carroll Kaylene Maxey, age 9.

This suit against Freightliner on behalf of the children and Billy's parents, Frank and Mary Maxey, followed. Trial to a jury resulted in no award to Billy's parents, awards totalling $150,000 to the two surviving daughters for the loss of their parents, and an award of $10,000,000 punitive damages. Not surprisingly the verdict has generated post verdict motions and extensive briefs.

### Jurisdiction and Parties

This is a diversity case concededly controlled by Texas law. All plaintiffs are citizens of Texas. Freightliner is a finan- cially successful company organized under the laws of the State of Delaware with its principal offices in Portland, Oregon. Having manufactured over 140,000 trucks of design similar to the death vehicle, Freightliner supplied approximately one-third ($280,000,000) of last year's gross receipts of its parent company, Consolidated Freightways ($870,627,000).

### The Vehicle

Freightliner designed the fuel system on the truck-tractor so that the diesel fuel containers, commonly called saddle tanks, were located near the frame rails. The design placed the fuel tanks in proximity to occupants and close to ignition sources. These aluminum tanks lacked a flexible bladder to absorb impact and fuel line fittings which would separate in a crash, devices designed to reduce the fire hazard of a crash. In the crash, the truck turned over on its right side. The plaintiffs urge that the absence of these safety features permitted the fuel in the left tank to pour through the fuel lines and spill on the ground through the rupture in the right tank. When the Maxeys bought the truck, it had a fuel tank on the left side only, but the fuel system design contemplated the addition of a right tank and Billy Maxey added a tank manufactured by Freightliner for that purpose.

### The Verdict

The jury answered Rule 49 interrogatories as follows:

*Question No. 1:* Did plaintiffs prove by a preponderance of the evidence that defendant's fuel system design contemplated and permitted the addition of the fuel tank on the right side at the option of the truck's owner?

*Answer:* Plaintiffs did prove.

*Question No. 2:* Did plaintiffs prove by a preponderance of the evidence that the design of the fuel system was unreasonably dangerous?

*Answer:* Plaintiffs did prove.

*Question No. 3:* Did plaintiffs prove by a preponderance of the evidence that the unreasonably dangerous design found in question number 2 was a producing cause of the death of (a) Billy Carroll Maxey and (b) Dee Maxey?

*Answer:* Plaintiffs did prove for both (a) and (b).

*Question No. 4:* Did plaintiffs prove by a preponderance of the evidence that the design of the right tank was unreasonably dangerous?

*Answer:* Plaintiffs did prove.

*Question No. 5:* Did the plaintiffs prove by a preponderance of the evidence that the unreasonably dangerous design found in question number 4 was a producing cause of the deaths of (a) Billy Carroll Maxey and (b) Dee Maxey?

*Answer:* Plaintiffs did prove for both (a) and (b).

*Question No. 6:* Did plaintiffs prove by a preponderance of the evidence that the fuel system design was unreasonably dangerous for lack of adequate warning?

*Answer:* Plaintiffs did not prove.

*Question No. 7:* Did plaintiffs prove by a preponderance of the evidence that the lack of an adequate warning found by you in question number 6 was a producing cause of the deaths of (a) Billy Carroll Maxey and (b) Dee Maxey?

*Answer:* Not answered for either (a) or (b).

*Question No. 8:* Did plaintiffs prove by a preponderance of the evidence that the right tank was unreasonably dangerous because it lacked an adequate warning?

*Answer:* Plaintiffs did not prove.

*Question No. 9:* Did plaintiffs prove by a preponderance of the evidence that the lack of an adequate warning found by you in question number 8 was a producing cause of the deaths of (a) Billy Carroll Maxey and (b) Dee Maxey?

*Answer:* Not answered for either (a) or (b).

*Question No. 10:* What amount of money, if any, if now paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Kalley Maxey and Carroll Kaylene Maxey for their pecuniary loss resulting from the death of Billy Carroll Maxey?

Answer as to Kalley Maxey:

| | |
|---|---|
| (a) care, maintenance, and support | $32,142.86 |
| (b) household services | $ 4,285.71 |
| (c) education, advice, and counsel | $ 6,428.57 |

Answer as to Carroll Kaylene Maxey:

| | |
|---|---|
| (a) care, maintenance, and support | $42,857.16 |
| (b) household services | $ 5,714.28 |
| (c) education, advice, and counsel | $ 8,571.42 |

*Question No. 11:* What amount of money, if any, if now paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Kalley Maxey and Carroll Kaylene Maxey for their pecuniary loss resulting from the death of Dee Maxey?

Answer as to Kalley Maxey:

| | |
|---|---|
| (a) care, maintenance, and support | $16,071.43 |
| (b) household services | $ 2,142.86 |
| (c) education, advice, and counsel | $ 3,214.28 |

Answer as to Carroll Kaylene Maxey:

| | |
|---|---|
| (a) care, maintenance, and support | $21,428.57 |
| (b) household services | $ 2,857.14 |
| (c) education, advice, and counsel | $ 4,285.72 |

*Question No. 12:* What amount of money, if any, if now paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Frank Maxey and Mary Amanda Maxey for their pecuniary loss resulting from the death of Billy Carroll Maxey?

Answer as to Frank Maxey: — 0 —

Answer as to Mary Amanda Maxey: — 0 —

*Question No. 13:* In addition to actual damages, under Texas law you are also permitted to award the plaintiffs exemplary damages. "Exemplary damages" means an amount which you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount which may have been found by you as actual damages. Exemplary damages may be awarded when death is caused by the willful act or omission or gross indifference of the defendant.

If you should find that it was gross indifference for the defendant to sell the truck, fuel container and fuel system as they were designed, or to sell the truck, fuel container and fuel system without adequate warnings of the dangers inherent in such design, then you may award such exemplary damages which in your discretion will deter the defendant and other manufacturers from such conduct.

Answer as to Kalley Maxey: $5,000,000.00

Answer as to Carroll Kaylene
 Maxey: $5,000,000.00

*Question No. 14:* Did defendant prove by a preponderance of the evidence that at the time and on the occasion in question, Billy Carroll Maxey voluntarily assumed the risk of his injuries?

*Answer:* Defendant did prove.

### The Present Dispute

Defendant urges entry of judgment denying any recovery because the jury found "an assumption of risk"; that punitive damages are not recoverable in a strict liability case; and that there is insufficient evidence to sustain a jury finding that Freightliner acted with an intent which approximates a fixed purpose to injure.

This opinion and order decides those questions necessary to a disposition of post-trial motions.

### I. *Assumption of Risk*

■ The first motion urged by Freightliner Corporation is that the jury's finding of assumption of risk on question number 14 bars all recovery. The finding of assumption of risk is not a bar for several reasons, the first being that it is not supported by the evidence.

The standard for reviewing the sufficiency of the evidence in this circuit is that:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to

the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. * .* *" *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) cited in *Trawick v. Manhattan Life Insurance Co. of N. Y., N. Y.,* 447 F.2d 1293, 1295 (5th Cir. 1971).

The jury found two different design characteristics to be defects and each to be a producing cause of the accident. Freightliner's evidence was insufficient to show that Billy Carroll Maxey knew or could "be charged in law with knowledge or appreciation" of the risk created by either defect. *Halepeska v. Callahan Industries, Inc.,* 371 S.W.2d 368, 381 (Tex.1963).

The jury found in answer to question number 2 that the design of the fuel system as a whole was defective. This design included the placement of the tanks behind the cab and dangerously close to the rails of the truck. The area behind the cab was shown to be a high impact zone, and placing the tanks near the rails of the truck unreasonably increased their exposure in the event of a collision.

The jury found in answer to question number 4 that the design of the right tank, the one which ruptured during the accident, was defective. Evidence showed that the tank was not reasonably crashworthy in that it lacked safety features such as a rubber bladder inside the tank to absorb any blows and fuel line fittings which would separate in a crash, minimizing the loss of fuel. Failure to add these safety precautions unreasonably increased the hazard of a post-crash fire.

■ In *Henderson v. Ford Motor Company,* 519 S.W.2d 87, 91 (Tex.1975), the Su-

preme Court of Texas explained that under the Texas cases "the inquiry is whether [Maxey] voluntarily exposed [himself] to the risk with knowledge and appreciation of the danger." "[T]he test of the plaintiff's actual knowledge and appreciation of a dangerous condition is measured subjectively; *i. e.*, by the plaintiff's actual, conscious knowledge." *Massman-Johnson v. Gundolf,* 484 S.W.2d 555, 557 (Tex.1972). Of course objective evidence that a plaintiff knew facts can support an inference of knowledge and appreciation of the danger. *Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex. 1975).

 Assumption of risk in products cases requires knowledge of both the specific defect and the risk of danger created by that defect. In *Ellis v. Moore,* 401 S.W.2d 789, 793 (Tex.1966), the court stated:

> "It was the clear holding of this Court . . . that the knowledge of the defect is not enough. There must be knowledge of the danger involved and the appreciation of the danger. This court pointed out . . . that there must be knowledge and appreciation of the particular danger involved so that the plaintiff proceeds to encounter the risk as the result of an intelligent choice." (citations omitted)

The plaintiff must be aware of the type and the extent of danger presented by the particular defect.

> "The intelligent choice to expose oneself to a danger presupposes an awareness of that particular danger. The success of

the *Volenti* defense in Texas has turned on whether or not it was established that the plaintiff knew he was exposing himself to the danger which in fact caused him harm." *Rabb v. Coleman,* 469 S.W.2d 384, 387 (Tex.1971).[1]

Under this test Maxey must have known and appreciated the risk that if his truck turned over, the fuel system was designed such that the tanks would contact the ground and that those tanks were not designed to sustain a reasonable impact, and if punctured, had no safety mechanisms to reduce fuel spillage. Otherwise stated, Maxey had to be aware of the danger of unreasonable risk of fire created by both defective designs.

There was no testimony as to Maxey's actual knowledge, but the tank's position relative to the rails of the truck was readily apparent. From this the jury could have reasonably inferred that Maxey knew that in the event of a turnover the tanks would probably contact the ground. However, even if this constitutes knowledge of this design characteristic, Freightliner understandably made no attempt to show that Maxey was aware of the extent of the fire hazard, nor was there evidence from which such knowledge could reasonably be inferred.

Regarding the second defect, Freightliner Corporation offered no evidence that Maxey was aware that the right tank lacked a safety bladder and cutoff valves, much less any proof that Maxey knew and appreciated the scope and risk of the danger created by this defect.

---

1. Requiring that an injured person be aware both of the "defect" in design *and* the dangerous condition is at the least dissembling. The defect is that some element of the design renders the product unreasonably dangerous. That is, defect is not an independent element of the claim but is a different label for that characteristic which renders the product unreasonably dangerous. The decision whether or not a product is unreasonably dangerous is the result of the trier of fact striking the balance between the utility and hazard of the design—a judgment more social than mechanical. Knowledge by a product user of all facts pertinent to this balancing would indeed be rare. If knowledge of "defect" requires this knowledge, the "defense" is virtually nonexistent. On the other

hand, if knowledge by a consumer of a product's hazards apparent from its usage is sufficient to trigger the defense, then there is liability only for latent defects. Tolerance of an assumption of risk defense in products cases, at least in design defect cases, is an apparent antinomy.

"No decision has been made by this Court to rule the case where the defendant manufacturer should have anticipated that the dangerous design would cause physical harm to one in the course of use similar to that which caused plaintiff's injury and notwithstanding the plaintiff user's knowledge of the danger." *Henderson v. Ford Motor Co.,* 519 S.W.2d 87, 91 (Tex. 1974).

Finally, any attempt to deny the jury's award of exemplary damages because of Billy Carroll Maxey's assumption of risk ignores the fact that the injuries to Mrs. Maxey can sustain the finding of punitive damages. The court of civil appeals stated in *Rourke v. Garza,* 511 S.W.2d 331, 338 (Tex.Civ.App.—Houston 1974) *aff'd* 530 S.W.2d 794 (Tex.1975):

> "We find no cases in this annotation, nor in our research, nor have any cases been cited to us, in which the knowledge of one other than the user has been imputed to the user as a basis for a finding of voluntary assumption of risk. It cannot be said that one voluntarily and unreasonably proceeds to encounter a known danger when the knowledge of the danger has been imputed to him by reason of the knowledge of a fellow employee."

The Texas Supreme Court in *Wilkinson v. Stevison,* 514 S.W.2d 895 (Tex.1975) did not hold to the contrary. In *Wilkinson* the court imputed contributory negligence from a husband to his wife engaged in a commercial or business joint enterprise. Contributory negligence is an objective standard, but the test for voluntary assumption of a known risk is a subjective one. Furthermore, negligence is now a comparative fault system, and strict products liability is a no-fault doctrine designed to protect consumers. With the added idea that assumption of risk is at best a narrow defense to this extension of liability, the logic in *Wilkinson* is inapplicable here. See footnote 1 at page 7.

The jury's finding to question number 14 is set aside.

## II. *Exemplary Damages*

Freightliner Corporation urges that the doctrine of strict liability and the remedy of exemplary damages are conceptually incompatible. Texas courts have not, however, barred the simultaneous presentation of both theories. At the least, the availability of exemplary damages in strict liability cases is an open question. Engaging in the *Erie* mandated guessing game as to the future course of Texas decisions, we have only one helpful opinion and its language is dicta. In *Heil Co. v. Grant,* 534 S.W. 916, 926 (Tex.Civ.App.—Tyler 1976), *writ ref'd, n. r. e.:*

> "Exemplary damages may be recovered for wrongful death resulting from a willful act or omission or gross negligence. Tex.Const. art. XVI section 26.

> \* \* \* \* \* \*

> "We believe that exemplary damages may be recovered under that provision of the Texas Constitution in a strict liability action for the death of the user of a defective product."

*Heil's* dicta provides guidance but is not controlling on the Texas courts, nor is it in turn binding on this court. Yet the federal court's role is not to decide the question afresh but to attempt to predict the course of Texas decisions.

The meaning of the argument that strict liability and recovery of punitive damages are conceptually incompatible is not clear. Certainly one is said to be a no fault and the other a fault concept. Equally certain is the absence of the type of inconsistency internal to a single concept such as that presented by recognition of assumption of risk as a defense to a design defect case. The bases of recovery for strict liability and exemplary damages are different. They are independent concepts. The purpose of one is compensation and the purpose of the other is deterrence. The focus of one is redistribution of loss and the focus of the other is punishment. They are related to the extent that actual injury must support an exemplary award and to the extent that some cases suggest that there must be a relationship between the amounts of actual and exemplary damages. Because they are different concepts, their differences in premises and purposes are beside the point. The question is whether these two theories of recovery ought to be joined in a single suit. Restating the question provides much of its answer. Certainly the federal rules are not hostile—indeed they may be said to be friendly to simultaneous presentation of single claims upon different theories. If

the risk of jury confusion is too great, separate trials are possible. Observation of actual trials of products cases suggests strongly that the academic concept of no fault has been slow to achieve full and absolute application by juries (or judges) drawn from Judeo-Christian disciplines. Moreover, the language of strict liability such as "unreasonably dangerous" is redolent with fault connotations. The point is that the risk of infecting a no-fault concept by simultaneous presentation of a fault based claim is exaggerated in a mind that fails to perceive that present formulation of strict liability grandly tosses fault out the front door but quietly brings much of it through the back door with language drawn from fault-riddled syntax.

■ In sum, simultaneous pursuit of actual damages bottomed on principles of strict liability and exemplary damages bottomed on fault concepts are essentially matters of trial efficiency and presents no true substantive issues. This court concludes that the Texas courts when squarely presented with the question will so hold.

Freightliner Corporation also urges that exemplary damage awards present its potential destruction. Product cases present a procedural anomaly—at least in design default cases. The proof of liability is usually made by a single plaintiff, but that proof is an indictment of all products of that design. Defendants do not, of course, urge that an adjudication binds it in other suits by different plaintiffs challenging the same design.[2] Discrete and seriatim defenses are in this sense advantageous to a manufacturer. But when a plaintiff attempts to recover punitive damages urging willful conduct, a defendant feels the pinch of multiple exposure. The pinch is that the amount of an exemplary award is not wholly controlled by the extent of injury suffered by the immediate plaintiff so that multiple cases can indeed be devastating. See *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967). Arguably, substantive right has

here outstripped its procedural brother because there is no available device for distribution of an exemplary damage award among all injured. But because exemplary damages do not have a compensatory function, difficulty in equitably distributing awards is not the prime problem. In other contexts, the windfall nature of exemplary awards is tolerated as a price of private achievement of a public goal of deterrence. But pointedly those cases are in procedural contexts which have available devices for preventing deterrence from becoming destruction. This is not to denigrate the decision of the jury. Each jury has before it only one case—it is the aggregate effect of several juries' faithful adherence to the law that poses risk of ultimate destruction. This is true although each award of exemplary damages was by an accurately instructed and wholly fair jury. The hazards presented by separate awards of exemplary damages for design defects common to thousands of products are real and apparent. Understandably, each plaintiff's counsel dons the robes of the public interest. And the premise of the private attorney general's role is that private interests of a plaintiff and the public are parallel. The rub, however, is that after the first award of exemplary damages, that parallelism is lost. Present tort law accepts the idea that manufacturers ought to be checked by deterrent based remedies. Yet we ought not in our quest for public safety lose sight of the obvious—with no products, there are *no* consumers.

Strict liability is in no small part a creature of state courts responding to present and forceful demands of consumers. Presumably these creating courts can fashion any limitation now necessary. With its *Erie* eyes focused upon the Texas Constitution Article XVI § 26, this court is not certain how any such refashioning could take the form urged by Freightliner. Stated directly, it is not clear how the Texas courts could hold, if they wished to, that

---

**2.** Yet mutuality of parties as a condition to application of collateral estoppel is under fire. See *Blonder-Tongue v. University Foundation,*

402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

punitive damages are not recoverable at all when the undergirding actual damages are supported by a strict liability theory.

■ Apart from its feasibility, this court is not persuaded that such a judicial fall-back is necessary. The potentialities of the exemplary damage awards make clear that Texas requirements of proof ought to be strictly applied. Demanding strict proof will reduce the hazard of deterrence slipping into destruction to those cases of conduct so egregious as to have little equitable appeal. If a manufacturer's conduct has indeed been so callous, its plight warrants no sympathy and such cases will not implicate the concerns that spring from a more lax application of the Texas requirement of proof.

It is against this background that the Texas measure is applied to proof here made.

### The Texas Standard

The inquiry is whether there is that complete absence of care as required by the Texas Supreme Court in *Sheffield Division Armco Steel Corporation v. Jones*, 376 S.W.2d 825, 828 (Tex.1964), on motion for rehearing:

"In order that a recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or willfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains. The mental factor is also described in the report by the terms 'malice,' 'fraud,' 'oppression,' 'recklessness,' and the like. Regardless of the expression which is used to describe it, the purpose or intention of the defendant is determinative of his liability for exemplary damages."

The Fifth Circuit has interpreted this Texas standard in the *Woolard v. Mobil Pipe Line Co.*, 479 F.2d 557, 565 (5th Cir. 1973).

"As these cases indicate, the Texas view of gross negligence contemplates something just short of intentional wrongdoing. . . . The Texas standard demands both advertence to reasonable risk of harm to the plaintiff and an entire want of care (not merely a failure to take reasonable precautions) to avoid harm to the plaintiff."

Plaintiffs claim to have produced sufficient evidence to support a jury finding of a complete absence of care, urging that the facts supporting this finding include the following:

1. The defendant did not protect the fuel tanks either by shielding on the outside or bladder on the inside to eliminate or reduce fuel spillage;

2. The defendant never tested this fuel system in a crash environment before marketing it;

3. The defendant had not, to the date of trial, ever crashed-tested one of its trucks nor had it considered doing so;

4. The defendant does not keep product performance records indicating how its vehicles are behaving in accidents;

5. As of the date of trial, the defendant had not kept records indicating the incidents of fire or the incidents of injury or death from post-crash fires in its trucks; and

6. The defendant did not obtain copies of governmental studies indicating statistical evidence of how tractor-trucks in general behave in accidents.

The argument is that from this the jury could have concluded that the defendant exhibited a conscious indifference to the rights and welfare of those using its products.

This enumeration overlooks one critical circumstance that overhangs all claims of Freightliner's intent. The design of its tanks, including both location and the absence of bladders or cut-off devices, is common to the entire trucking industry. Virtually every large freight truck in the United States employs a substantially similar design. Moreover, fuel bladders, as appealing

as their usage may be given their apparent simplicity of manufacture, have not been used in tanks in any of the millions of automobiles now on the road. Finally, no government regulator has moved against any of these designs despite their pervasive usage.

■ Although industry standards may not provide a defense to the strict liability claim, exemplary damages are bottomed upon fault. Yet conformity to industry practice is not necessarily a defense to fault. An entire industry may be negligent or inattentive. The critical circumstance is that to sustain this award one must be prepared to hold that the entire automotive and trucking industry in the United States has ". . . acted intentionally or willfully or with that degree of 'gross negligence' which approximates a fixed purpose to bringing about . . . injury . .". *Woolard v. Mobil Pipe Line Company*, 479 F.2d 557, 565 (1973). Refusing to do so on this record is not simply an expression of a more sanguine view of business and industry than was held by the jury. Nor is the refusal an expression of blind faith that the entire trucking and automotive industry cannot be at fault. It is to say that adopting a design common to all manufacturers and millions of vehicles for over thirty years is a sufficient effort at safety to preclude a finding that Freightliner acted with an intent which approximates a fixed purpose to bring about this injury.

### The Amount of the Award

Because the Court of Appeals may disagree with the court's conclusion that no award of exemplary damage can be sustained, the court will deal with the amount of the award.

■ Where exemplary damages are allowed, the amount should be reasonably proportional to the evidence of purposeful conduct and not a product of passion or prejudice. The primary purposes of exemplary damages are punishment and deterrence. It is proper for the jury to conclude that the amount of punitive damages should be sufficient to assure that manufac-

turers ought not profit from producing defective products in a grossly indifferent fashion. The larger the company, the larger the award of punitive damages must be in order to bring this message home.

In arguing that the exemplary damages awarded are wholly excessive, the defendants have cited numerous Texas cases which require that a reasonable ratio be maintained between the award of actual and exemplary damages. Here the jury's award for punitive damages was approximately 60 times its award for actual damages. The plaintiffs argue that federal law, not state law, determines the reasonableness of a jury's award and that in any event, the jury's finding of exemplary damages should be reasonably proportional not to the amount of actual damages awarded, but to the evidence and the purpose of the award.

Plaintiffs cite *Brown v. Louisiana & Arkansas R.R. Co.*, 429 F.2d 1265, 1267 (5th Cir. 1970) for the proposition that federal juries are not bound by Texas law in awarding damages.

"We are not materially aided in the consideration of the problems presented to us by Railway's citation of numerous somewhat similar Texas cases in which a remittitur had been ordered by Texas appellate courts. Federal juries are not bound by the amounts Texas juries have awarded or Texas courts have approved or disapproved in similar cases. It is for each federal jury to weigh the facts presented to it and award appropriate damages."

The *Brown* case was a F.E.L.A. case and concerned allegedly excessive actual damages. For authority for the proposition stated, however, the Fifth Circuit cited *Silverman v. Traveler's Ins. Co.*, 277 F.2d 257 (5th Cir. 1960). There the facts involved a car collision between students and evidently the basis for jurisdiction was diversity. The court stated:

"To show an abuse of discretion by the trial judge, appellants cite Louisiana cases in which the appellate court af-

firmed a larger verdict than the jury awarded in the instant case. But federal juries are not bound by the amounts Louisiana juries and Louisiana courts have awarded for wrongful death. Each federal jury determines the facts in the case before it and, under the Seventh Amendment, the jury's verdict cannot be re-examined; although the district court, in its discretion, may set aside the verdict and grant a new trial. . . . However, the right of recovery for wrongful death and the elements of damages to be considered by the jury in its verdict and by the district court in the exercise of its discretion to grant a new trial are determined by Louisiana law." *Id.* at 260.

Although not bound by what Texas courts would do, it is helpful to look at some of the principles followed by Texas courts in dealing with exemplary damages in tort cases. One carefully stated test is found in *Skillern & Sons, Inc. v. Stewart*, 379 S.W.2d 687, 692 (Tex.Civ.App.—1964, *writ ref'd* n. r. e.):

"The question of the measure of exemplary damages comes under the general rule that, where the law furnishes no legal measure of damages and they are unliquidated, the amount to be awarded rests largely in the discretion of the jury; and unless the award is so large as to indicate that it is a result of passion, prejudice or corruption, or that the evidence has been disregarded, the verdict of a jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal."

 Texas juries have never been required to adhere to a strict ratio in finding exemplary damages. See *Tynberg v. Cohen*, 76 Tex. 409, 13 S.W. 315, 316–317 (Tex. 1890):

"It has been said in some cases that exemplary damages should not be disproportioned to actual damages, but it was not meant by this that the one should be an exact or proximate ratio to the other. All that was meant was that the imposition of heavy exemplary damages, when the actual damages recoverable were small, was *a fact* which ought to be looked to, to determine whether passion rather than reason dictated the verdict. Whenever this appears, or is rendered highly probable, by contrasting the actual injury with the extent of punishment awarded, looking to all the circumstances of aggravation, new trials should be granted."

Rather than look to any precise ratio, a jury should look at the factors set out in *Mayer v. Duke*, 72 Tex. 445, 10 S.W. 565 (Tex.1889) which include such matters as (1) the degree of outrage produced by the evil, (2) the frequency of the evil, and (3) the size of the award needed to deter similar wrongs in the future.[3] That court also emphasized deference to jury findings:

"The amount of exemplary damages is largely in the discretion of the jury, and this court can only set aside their verdict for excess an amount in such cases where the damages are so large as to show passion, prejudice or partiality." *Id.* at 569.

The defendants contend that the Texas Supreme Court in *Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705 (Tex. 1970) established some sort of ratio of proportionality for exemplary damages to actual damages. In that case the court of civil appeals had reduced the jury's award of actual damages while leaving undisturbed the award for exemplary damages. The Supreme Court remanded holding:

---

**3.** Curiously, there is a line of cases [see *Texas Public Utilities Corp. v. Edwards*, 99 S.W.2d 420, 427 (Tex.Civ.App.—Austin 1936, writ dism'd)] which hold that the defendant's profits may not be considered in assessing exemplary damages. Such a rule would leave the jury wholly without guidance in determining the amount of damages necessary to deter. The practical result of this rule would be to deny deterrence as a purpose of exemplary damages contrary to *Mayer v. Duke, supra.* Here the jury was allowed to consider defendant's earnings for the limited purpose of assessing exemplary damages. Although no party has so contended, if this was error and if plaintiffs otherwise had sufficient evidence to go to the jury, defendant is entitled to a new trial on the issue of the amount of exemplary damages.

"We now hold that when a court of civil appeals suggests a remittitur of a substantial portion of the actual damages found by a jury, the court of civil appeals is under an obligation to give consideration to the ratio between exemplary and actual damages as established by the jury in passing on the further question of excessiveness of exemplary damages." *Id.* at 708.

This suggests not an adoption of a rigid ratio or proportion of exemplary damages to actual damages, but rather that the court of civil appeals in reducing one award but not the other cannot ignore the ratio established by the jury. The emphasis was on the ratio found by the jury based on the facts in a particular case, and not on any absolute proportion of exemplary to actual damages.

■ The jury's award here was within the range allowed by the substantive law. This court will not substitute its judgment for the jury's. Had the threshold to the jury been reached, this award would have been sustained. There is a temptation to avoid a direct confrontation with the sufficiency of evidence of defendant's intent by reducing the award. Such an approach misapprehends the court's and jury's role. That is, if we assume that the jury could have properly found Freightliner's conduct met the requirements for an award of punitive damages, then this sum ought to be sustained. This jury's award of actual damages was, on the facts, modest. Indeed the jury refused to award any sum to Billy's parents although a substantial sum would have been supportable. There is no suggestion that the award of exemplary damages was the product of passion or prejudice or the result of other than strongly held beliefs about the adequacy of the truck design.

### Conclusion

Under a strict application of the Texas standard, Freightliner's adoption of a design common to the country is sufficient to prevent an award of exemplary damages. Whether in later cases such adherence will be sufficient will depend on Freightliner and the industry's response to any accumulation of evidence of defects. At least with the passage of time the inference of intent under a strict standard may become reasonable and Freightliner, or others, may fall into that category of companies whose exposure to multiple exemplary damage awards need give us little pause; that is, a defendant whose conduct demonstrably ". . . approximates a fixed purpose to bring about the injury of which the plaintiff complains . . .".

### Order

The parties will submit a proposed form of judgment. Although these motions were filed before entry of judgment, this order will be the ruling of the court upon the usual motions which follow entry of judgment under Rule 58, Fed.R.Civ.P. See Rule 50(b).