469 A.2d 655

**Joseph Edward MARTIN, Appellant at No. 1323 Pgh. 1982,**

**v.**

**JOHNS–MANVILLE CORPORATION, Pittsburgh Corning Corporation, Owens-Corning Fiberglas Corp., Eagle-Pitcher Industries, Inc., Forty-Eight Insulations, Inc., the Celotex Corporation, Keene Corporation, Unarco Industries, Inc., Combustion Engineering Inc., and Raybestos Manhattan, Inc.**

**v.**

**INDUSTRIAL FURNACE SUPPLIES, INC.,**

**v.**

**OWENS–ILLINOIS, INC.**

**Appeal of COMBUSTION ENGINEERING, INC., at No. 1322 Pgh. 1982.**

Superior Court of Pennsylvania.

Argued April 25, 1983.

Filed Dec. 2, 1983.

Petition for Allowance of Appeal Granted April 2, 1984.

352

Richard K. Willman, Pittsburgh, for Combustion Engineering, appellant (at No. 1322) and appellee (at No. 1323).

William R. Caroselli, Pittsburgh, for Martin, appellant (at No. 1323) and appellee (at No. 1322).

Patrick R. Riley, Pittsburgh, for Owens-Corning, appellee.

Kathleen S. McAllister, Pittsburgh, for Celotex, appellee.

John W. Jordan, IV, Pittsburgh, for Raybestos, appellee.

Before CERCONE, President Judge, and SPAETH, HESTER, CAVANAUGH, WICKERSHAM, WIEAND and HOFFMAN, JJ.

SPAETH, Judge:

This case arises on an appeal and cross-appeal. Appellant, Joseph Edward Martin,[1] seeks compensatory and punitive damages for asbestosis and related diseases. He received a verdict, but in his view it was inadequate and he asks us to reverse the trial court's denial of his motion for a new trial limited to the issue of damages. He argues that the trial court erred in: (1) excluding evidence that he might develop bronchogenic carcinoma as a result of his exposure to asbestos; (2) instructing the jury that it could reduce its award of damages to reflect the amount of harm attributable to his cigarette smoking; (3) refusing to submit the issue of punitive damages to the jury; and (4) refusing to admit certain medical exhibits into evidence. Cross-appellant, Combustion Engineering, Inc., also an appellee, argues that the trial court erred in refusing to grant its motion for judgment n.o.v. and in refusing to remove the verdict that had been directed in favor of Raybestos-Manhattan, Inc. As to appellant: We hold that the trial court did not err with respect to the medical exhibits but did err in excluding evidence that appellant might develop bronchogenic cancer and in refusing to submit the issue of punitive damages to the jury. (We need not reach the cigarette smoking issue.) We therefore reverse and remand for a new trial limited to the issue of damages. As to cross-appellant: We find no error and therefore as to it, we affirm.

−1−

Joseph Edward Martin was an insulation worker whose work brought him into repeated contact with asbestos fibers. In August 1978 he brought this trespass action, seeking compensatory and punitive damages for asbestosis and related diseases. The action was tried to a jury, which awarded compensatory damages of $67,000 against all of the defendants other than Raybestos-Manhattan, Inc.

Appellant argues, first, that the trial court erred in granting appellees' motion in limine to exclude evidence that his

1. We are advised that Martin has died. Brief for Appellant Martin at 5.

exposure to asbestos increased his risk of contracting bronchogenic carcinoma. We agree.

■ It is settled that a plaintiff in a personal injury action may introduce expert testimony that as a result of the past injury for which he seeks compensation, he may experience certain adverse physical effects in the future.[2] *Walsh v. Brody*, 220 Pa.Super. 293, 286 A.2d 666 (1971); *Schwegel v. Goldberg*, 209 Pa.Super. 280, 228 A.2d 405 (1967); *Boyle v. Pennsylvania R. Co.*, 403 Pa. 614, 170 A.2d 865 (1961). The reason for permitting expert testimony regarding the plaintiff's prognosis was well-stated in *Schwegel:*

> There is nothing evidentially improper about this testimony. If we were to rule it out we would be holding that such possible future effects are not entitled to any consideration as a matter of substantive law. See II Wigmore, Evidence § 663(1), (3d Ed.1940). That would be unfair since the action must be brought within the time limitations fixed by our law and all damages, past, present and future, must be determined in that one action.

*Id.* 209 Pa.Super. at 287, 228 A.2d at 409.

*See also Staiano v. Johns-Manville Corp.*, 304 Pa.Super. 280, 296, 450 A.2d 681, 688 (1982) ("[N]ew limitation period does not start to run each time a new disease develops from the same tortious conduct of the defendant."); *Shadle v. Pearce*, 287 Pa.Super. 436, 430 A.2d 683 (1981) (same).

**2.** This is not to say that testimony regarding the risk of future adverse effects from past injury is invariably sufficient to warrant submission of the question whether the plaintiff should be compensated for such future effects. Although an expert testifying as to prognosis "cannot be required to express his opinion with the definiteness required in a causation question," *Stevenson v. Pennsylvania Sports and Enterprises, Inc.*, 372 Pa. 157, 165, 93 A.2d 236, 240 (1952); *see also Hamil v. Bashline*, 481 Pa. 256, 273 n. 10, 392 A.2d 1280, 1288 n. 10 (1978), an expert's mere conclusion that the plaintiff may suffer certain adverse effects in the future, without any discussion of the likelihood that that will occur, is insufficient to warrant submission of the question whether the plaintiff is entitled to damages for such future effects. *See Lorch v. Eglin*, 369 Pa. 314, 85 A.2d 841 (1952), *construed in Schwegel v. Goldberg*, 209 Pa.Super. 280, 228 A.2d 405 (1967). *See also Baccare v. Mennella*, 246 Pa.Super. 53, 369 A.2d 806 (1976).

In opposition to appellees' motion to exclude any "reference to cancer," N.T. 32, appellant's counsel submitted the following offer of proof:

MR. CAROSELLI: In the report of Dr. Sachs, which has been offered and attached to our pretrial statement, there is an indication that this man is at risk of contracting cancer. Pennsylvania courts have adopted that the risk of cancer is, in fact, damage in personal injury cases and in this regard I believe that any testimony in that regard ought to be allowed.

THE COURT: Anybody else wish to speak to it?

THE COURT: Mr. Caroselli, are you going to have any evidence whatsoever that this plaintiff of yours has or ever had any cancer?

MR. CAROSELLI: I don't know, your Honor. He has some symptomatology that is consistent with perhaps having cancer.

Dr. Sachs indicated in his report he had hemoptysis—

THE COURT: What is that?

MR. CAROSELLI: Coughing of blood. I believe it will be Dr. Sachs' testimony that based on the exposure that he has had, based on the symptomatology that he has, that there may, in effect, be cancer which exists now, which is not detectable but he is most certainly at risk.

THE COURT: The motion to exclude any reference to cancer by any of the witnesses is granted.

\* \* \* \* \* \*

MR. CAROSELLI: May I have a clarification on that. Do you mean that Dr. Sachs cannot talk about the risk of this man?

THE COURT: There will be no mention of cancer in any shape or form.

N.T. at 32–35.

In explaining this ruling, the trial court states that appellant's offer of proof was inadequate: "The Plaintiff did not offer to introduce any other evidence or testimony of the possibility of developing cancer as a result of asbestos

exposure, such as a statistical or an epidemiological analysis of the risk." Slip op. at 5.

An offer of proof is adequate if it "state[s] the purpose [of the testimony sought to be introduced] in such a manner that the court may perceive its relevancy ...." *Germantown Dairy Co. v. McCallum*, 223 Pa. 554, 561, 72 A. 885 (1909), *quoted in Cockcroft v. Metropolitan Life Insurance Co.*, 133 Pa.Super. 598, 602, 3 A.2d 184, 186 (1938). *See also Societa Palmolese Di Protezione E. Beneficenza v. Maiale*, 143 Pa.Super. 403, 17 A.2d 925 (1941); *Barrilo v. Frank*, 116 Pa.Super. 461, 177 A. 58 (1935). Here, appellant's offer was adequate to inform the trial court that the purpose of his expert's testimony would be to show that his exposure to asbestos increased his risk of contracting cancer, and that his hemoptysis indicated that he might already have cancer. Indeed, the court's opinion reveals that it understood this to be the purpose of the testimony. Thus the court states: "In opposition to the defendants' motion in limine, the plaintiff relied solely upon the Sachs report and Sachs' proposed testimony consistent therewith. The plaintiff indicated that Sachs' testimony regarding Martin's risk of developing cancer would be based upon Martin's history of asbestos exposure and the incidence of hemoptysis." Slip op. at 4–5. In addition, the proffered testimony was patently relevant to the question whether appellant was entitled to recover damages to compensate for the risk that he might suffer adverse effects in the future as a result of his past exposure to asbestos. The trial court therefore erred in ruling that appellant's offer of proof was inadequate.

Appellees argue, however, that the trial court's ruling was nonetheless proper under Rule 212 of the Allegheny County Rules of Civil Procedure, which provides:

A. Plaintiff, within thirty (30) days after notice of a pre-trial conciliation conference as provided in Paragraph II hereof:

(1) Shall serve upon all parties a written statement containing:

&ast; &ast; &ast; &ast; &ast; &ast;

(d) The reports of any expert whose opinion will be offered in evidence at the time of trial. Such reports shall include the findings and conclusion of the expert.

&ast; &ast; &ast; &ast; &ast; &ast;

E. Witnesses whose identities have not been revealed as provided in paragraph VI.A.(1)(b) and VI.C.(1)(a), or whose reports have not been furnished under VI.A.(a)(c) and (d) and VI.C.(1)(c) and (d), *supra* will not, under any circumstances whatsoever, be permitted to testify at the subsequent trial of the case.

Appellees do not argue that appellant failed to notify them that Dr. Murray Sachs would testify as an expert witness on their behalf, or that appellant failed to provide them with a copy of Dr. Sachs's report. Rather, they argue that the statements in Dr. Sachs's report that appellant suffered from "chronic obstructive lung disease with asbestosis," and that he could not "exclude the possibility of bronchogenic carcinoma and [that] this diagnosis must be considered particularly in light of his recent hemoptysis," did not represent a sufficient statement of "findings and conclusions" to the effect that appellant might contract cancer as a result of his exposure to asbestos.

The purpose of Rule 212 was stated in *Sindler v. Goldman*, 309 Pa.Super. 7, 12, 454 A.2d 1054, 1056 (1982) (footnote omitted):

The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject with which to effectively rebut unexpected testimony. By allowing for early identification of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of expertise on the spot. Thus, the rule serves as more than a procedural

technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify.

Since the purpose of the rule is to prevent surprise, we have found experts' reports to be adequate to preserve the party's right to examine the expert on a particular issue at trial when the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. *Compare Starr v. Allegheny General Hospital*, 305 Pa.Super. 215, 451 A.2d 499 (1982) (Expert's report stating that appellant's condition was not caused either by operation undertaken to repair damage to skull or by post-operative care sufficient to put appellees on notice that expert would testify that initial injury to skull was cause of condition, so that expert testimony to that effect was proper under Rule 212) *and Piekarski v. Club Overlook Estates, Inc.*, 281 Pa.Super. 162, 174–76, 421 A.2d 1198, 1205 (1980) (Expert's report setting forth his "central conclusions" was sufficient to preserve party's right to examine witness on that subject under Rule 212 because it "enabled [the opposing party] to present an appropriate rebuttal witness to contest this point and other points related to it") *with Bell v. Western Pennsylvania Hospital*, 293 Pa.Super. 37, 40–41, 437 A.2d 978, 980 (1981) (Because expert's report that there was "no evidence of negligence" did not put plaintiff on notice that expert would testify that plaintiff was not in fact injured, testimony to this effect should have been precluded under Rule 212).

■ Here, Dr. Sachs's statements that appellant had asbestosis, and that he could not "exclude the possibility of bronchogenic carcinoma" were adequate to place appellees on notice that appellant might advance the theory at trial that his exposure to asbestos had increased his risk of contracting bronchogenic carcinoma and that he was entitled to be compensated in damages for this increased risk.[3]

---

**3.** Appellees emphasize that Dr. Laman's report, with which appellant also provided them under Rule 212 and which postdated Dr. Sachs's report by over three years, does not refer to the risk of cancer and states that appellant "denie[d] hemoptysis." Neither of these features undermines the fact that appellees should have discerned from Dr.

The trial court's ruling granting appellees' motion in limine therefore cannot be upheld as proper under Rule 212, and a new trial must be granted.[4]

–2–

■ Appellant asks, not simply for a new trial, but a new trial limited to the issue of damages. We have held that a new trial limited to the issue of damages may be granted where "(1) the issue of liability [was] fairly determined, and (2) the question of damages [is] readily separable from the issue of liability...." *Reid v. Oxendine*, 275 Pa.Super. 548, 556, 419 A.2d 36, 40 (1980) (citing *Lambert v. P.B.I. Industries*, 244 Pa.Super. 118, 366 A.2d 944 (1976)). These conditions are fulfilled here. The fact that appellant was harmed as a proximate result of his exposure to asbestos products manufactured by appellees[5] was "fairly established" at trial;[6] and the issue of appellees' liability is "readily separable" from the question whether cancer was one of the adverse effects for which appellant is entitled to receive damages. We therefore conclude that the new trial should be limited to the issue of damages.[7]

Sachs's report that he was prepared to testify that, even if appellant did not yet have lung cancer, he was more likely to contract it *in the future* than he would have been had he not been exposed to asbestos.

4. Given this conclusion we need not address appellant's argument that he is entitled to a new trial on the basis of after-discovered evidence.

5. This characterization of appellant's injury for purposes of determining the issue of liability comports with our decision in *Staiano v. Johns-Manville Corp., supra,* that a plaintiff's injury for statute of limitations purposes comprises *some* harm resulting from the inhalation of asbestos fibers and not the development of *each* resulting disease.

6. This is not a case in which the issue of liability was "vigorously contested" and the verdict so low as to "indicate [ ] that the jury probably ... compromised the liability issue with the amount of damages awarded ...." *Dougherty v. Sadsbury Township*, 299 Pa.Super. 357, 361, 445 A.2d 793, 795 (1982).

7. Given this conclusion, we need not address appellant's argument that appellees failed to present evidence that provided a basis for the trial court's instruction that the jury could reduce its award of damages to reflect the "percent[age] of his condition [that] is due to

██ Since it may be expected that at the new trial that we have concluded must be granted, appellant will again seek to recover punitive damages, we shall address appellant's argument that the trial court erred in refusing to submit the issue of punitive damages to the jury. In support of the trial court's ruling, appellees argue that punitive damages should not be recoverable: (1) "against a mass marketer where its exposure to multiple claims is unlimited ....," Brief for Appellees at 29; (2) against a successor corporation; and (3) where at the time of the acts complained of, "medical and scientific authorities were in strong disagreement" as to the harmfulness of such exposure, Brief for Appellees at 25.[8]

cigarette smoking ...." Slip op. at 35. We note, however, that in certain circumstances a jury may reduce its award to reflect the percentage of harm attributable to: (1) a pre-existing condition that has been aggravated by the injury complained of, *Freer v. Parker*, 411 Pa. 346, 192 A.2d 348 (1963); *Pavorsky v. Engels*, 410 Pa. 100, 188 A.2d 731 (1963); RESTATEMENT (SECOND) OF TORTS § 433A(1)(b) comments a & e, illustration 8 (1965); and (2) the plaintiff's failure to mitigate damages by taking steps that an ordinarily prudent person would take to minimize his injury, *Bartunek v. Koch*, 404 Pa. 1, 170 A.2d 563 (1961); *Potts v. Guthrie*, 282 Pa. 200, 127 A. 605 (1925); *Downs v. Scott*, 201 Pa.Super. 278, 191 A.2d 908 (1963); *Hilscher v. Ickinger*, 194 Pa.Super. 237, 166 A.2d 678 (1960), *aff'd* 403 Pa. 596, 170 A.2d 595 (1961): RESTATEMENT (SECOND) OF TORTS § 918(1) (1979), § 433A(1)(b) comment f (1965). We also note that the burden of establishing that the harm suffered by the plaintiff is capable of apportionment between the harm caused by the defendant and that attributable either to the plaintiff's pre-existing condition or to his failure following the injury to mitigate damages rests on the defendant. *See Johns-Manville v. Superior Court of Contra Costa County*, 27 Cal.3d 465, 612 P.2d 948, 165 Cal.Rptr. 858 (1980); RESTATEMENT (SECOND) OF TORTS § 433A comment g, § 433B (1965). *Cf. Wade v. S.J. Groves & Sons Co.*, 283 Pa.Super. 464, 424 A.2d 902 (1981) (Burden of establishing that harm may be apportioned among defendants is on defendant seeking apportionment).

8. The trial court notes that appellees did not dispute "[t]he propriety of allowing punitive damages in a products liability action ... in the post-trial motions ...." Slip op. at 10. We nonetheless shall consider appellees' argument to us. As we have observed, the issue of punitive damages may be expected to arise at the new trial. Moreover, we may uphold the trial court's ruling on any ground, whether or not it was argued. *See Baltimore & Ohio Railroad Co. v. Department of Labor & Industry*, 461 Pa. 68, 83 n. 10, 334 A.2d 636, 643 n. 10 (1975);

### a) *Punitive Damages Awards in Products Liability Actions*

■ Appellees rely on the views expressed by Judge FRIENDLY in *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir.1967). Among the questions presented in that diversity action was whether under New York law an award of punitive damages against Richardson-Merrell was proper for its failure to warn consumers that MER/29 was cataractogenic. The court stated at the onset that the issue was one

> of extreme significance not only in monetary terms to this defendant in view of the hundreds of pending MER/29 actions and to the plaintiff as well, but from a longer range, to the entire pharmaceutical industry and to all present and potential users of the drugs.
>
> *Id.* at 838.

After calculating that "[i]f all [plaintiffs] recovered punitive damages in the amount here awarded these would run into tens of millions ....," the court confessed to having "the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill," and emphasized that "it [does not] seem either fair or practicable to limit punitive recoveries to an indeterminate number of first-comers ...."[9] *Id.* at 839. The court further observed that if insurance against punitive damages were available, the deterrent effect of such damages would be greatly blunted, for the cost of the insurance could simply be "passed on to the consuming public," and

> if they cannot, as is held by other courts and recommended by most commentators, a sufficiently egregious error as to one product can end the business life of a

*Justin J. Powell, Inc. v. Wian,* 456 Pa. 35, 40 n. 3, 318 A.2d 346, 349 n. 3 (1974).

**9.** *Cf. In re Related Asbestos Cases,* 566 F.Supp. 818 at 822 (N.D.Cal. 1983) ("[T]he assets of a successor corporation could arguably suffer such serious depletion as a result of punitive damages suits, that the corporation would be unable to provide compensatory damages to future plaintiffs genuinely in need of ... recovery").

concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin.

*Id.* at 841.[10]

Despite its conclusion that permitting the recovery of punitive damages might "do more harm than good," the court acknowledged that "New York cases afford no basis for ... predicting that the Court of Appeals would adopt a rule disallowing punitive damages....," and went on to conclude that the evidence was insufficient to support an award of punitive damages. *Id.* at 840–41.

We acknowledge our indebtedness to the court's thoughtful opinion in *Roginsky.* We have concluded, however, that the better course is to permit punitive damages in products liability actions, and in what follows we shall explain our disagreement with *Roginsky.*[11]

**10.** In addition, the court questioned the need for achieving deterrence through punitive damages in light of the fact that the defendant before it was already subject to vigorously enforced federal food and drug requirements. *Id.* at 840.

**11.** Appellees in their brief state that "other courts who have squarely faced the issue have unequivocally denied any entitlement for punitive damages against mass marketers," citing *deHaas v. Empire Petroleum Co.,* 435 F.2d 1223 (10th Cir.1970). Brief for Appellees at 29–30. This is a misstatement, for which we see no excuse. First, *deHaas* did not "squarely face[ ] the issue" here presented; rather, it held that punitive damages were not recoverable in private securities actions under Rule 10b–5. Second, appellees have cited no decision in which the court *did* accept *Roginsky's* invitation to prohibit punitive damages awards in products liability actions. Finally, appellees do not mention that that invitation has been rejected in the following cases: *Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811 (6th Cir.1982); *Neal v. Carey Canadian Mines Ltd.,* 548 F.Supp. 357 (E.D.Pa.1982); *Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.,* 515 F.Supp. 64 (D.S.C.1979), *aff'd,* 644 F.2d 877 (4th Cir.1981); *Maxey v. Freightliner Corp.,* 450 F.Supp. 955 (N.D.Tex.1978), *aff'd* 623 F.2d 395 (5th Cir. 1980); *Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38 (Alaska 1979), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Froud v. Celotex Corp.,* 107 Ill.App.3d 654, 63 Ill.Dec. 261, 437 N.E.2d 910 (1982); *Unified School District No. 490 v. Celotex Corp.,* 6 Kan.App.2d 346, 629 P.2d 196 (1981); *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727 (Minn.), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Rinker v. Ford Motor Co.,* 567 S.W.2d 655 (Mo.App.1978);

### (i) *Purpose of Punitive Damages*

Our courts have long permitted punitive damages in order to punish and deter outrageous or reckless conduct.[12] *Focht v. Rabada*, 217 Pa.Super. 35, 268 A.2d 157 (1970); *Evans v. Philadelphia Transportation Co.*, 418 Pa. 567, 212 A.2d 440 (1965); *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963) (adopting RESTATEMENT (SECOND) OF TORTS § 908 (1979)). Defendants opposing punitive damages in products liability actions have protested that the prospect of having to pay compensatory damages and of injury to their reputations is adequate to deter reckless marketing practices. But as the Supreme Court of Minnesota has observed, this argument is disingenuous:

> This argument [that compensatory damages and injury to reputation deter reckless conduct] ignores the fact that [the defendant] was shown to have acted in reckless disregard of the public for purely economic reasons in the past. A punitive damages award serves to deter [the defendant] from acting in a similar manner with respect to other products manufactured by it in the future. Furthermore, since the potential of compensatory damages awards and loss of sales and reputation did not serve to deter [the defendant] in the past, [the defendant] cannot now argue that these considerations act as an adequate deterrent.

*Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 741 (Minn.), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).

*State ex rel. Young v. Crookham,*. 290 Or. 61, 618 P.2d 1268 (1980); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437 (1980). *See also Acosta v. Honda Motor Co., Ltd.*, 717 F.2d 828 (3d Cir.1983).

**12.** Additional reasons that have been advanced in support of punitive damages in product liability actions include the recovery of attorney's fees, *see Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co., supra;* Owen, *Punitive Damages in Products Liability Litigation*, 74 MICH.L.REV. 1257 (1976) and the recoupment of unjust enrichment, *Sturm, Ruger & Co., Inc. v. Day, supra,* 594 P.2d at 47 ("[I]f punitive damages could not be awarded in the products liability context, a reckless manufacturer might gain an unfair advantage over its more socially responsible competitors"); Owen, *supra.*

*See also Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.*, 515 F.Supp. 64, 107 (D.S.C.1979), *aff'd*, 644 F.2d 877 (4th Cir.1981) (Threat of multiple punitive awards "forces a prudent manufacturer intent on maximizing profits to hesitate before marketing a known defective ... or an untested product"); *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 47 (Alaska 1979) ("[T]he threat of punitive damages serves a deterrence function ... in cases in which it would be cheaper for the manufacturer to pay compensatory damages to those who did present claims then [*sic*] it would be to remedy the product's defect"); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 285, 294 N.W.2d 437, 451 (1980) ("[M]ere compensatory damages might be insufficient to deter the defendant from further wrongdoing [; s]ome may think it cheaper to pay damages or a forfeiture than to change a business practice").

The conclusion that punitive damages are a needed deterrent against reckless business practices is also supported by the fact that their availability can increase the number of suits brought: "[T]he threat of punitive damages serves a deterrence function in cases in which a product may cause numerous minor injuries for which potential plaintiffs might [otherwise] decline to sue ...." *Sturm, Ruger & Co., supra*, 594 P.2d at 47. *See also State ex rel. Young v. Crookham*, 290 Or. 61, 618 P.2d 1268 (1980); *Wangen v. Ford Motor Co., supra*.

As we have noted, the *Roginsky* court disputed the premise that the threat of punitive damages provides needed deterrence on the ground, *inter alia*,[13] that if insurance against liability for punitive damages were available, companies could simply insure against the risk and pass this cost on to consumers. But, as the Supreme Court of Wisconsin has observed, it is by no means self-evident that a manufacturer will choose to pass the cost of insurance on to consumers:

**13.** The court's observation that additional deterrence in the form of punitive damages was not there needed because alternatively provided through federal food and drug requirements, *see* note 8, *supra*, is of course not applicable here.

"It does not follow under economic logic that a punitive damage award will be passed on in whole or in part as a cost of doing business. It may or may not, depending upon Ford's price standing in relation to its competitors and its own financial condition. It could mean lower profits for Ford. It could result in stockholder complaints about a lower profit margin because of punitive damage awards for unsafe cars, thereby spurring Ford on to exercise more care in the safe design of its automobiles. It could result in a greater scrutiny by Ford's management of its auto design from the safety standpoint. All of these changes, with the exception of lower profits or higher costs, if they were to take place, would benefit the public as a whole." *Wangen v. Ford Motor Co., supra,* 97 Wis.2d at 288, 294 N.W.2d at 452 (quoting *Barager v. Ford Motor Co.,* (Memorandum Decision dated September 15, 1977, Circuit Court for Eau Claire County).

Nor is there reason to assume that the cost of punitive damage liability coverage would not be considerable, particularly for a company against which punitive damages have already been awarded. *See Roginsky v. Richardson-Merrell, Inc., supra,* 378 F.2d at 841 (Court noted that compensatory liability insurance did not eradicate deterrent effect of compensatory awards, explaining that "the total limited, bad experience is usually reflected in future rates ...."); Owen, *Punitive Damages in Products Liability Litigation,* 74 MICH.L.REV. 1257, 1309 (1976) ("[P]roducts liability insurance is written on a retrospective or 'loss-rated' basis in which premiums are calculated primarily on the manufacturer's past loss experience") (footnotes omitted); Morris, *Enterprise Liability and the Actuarial Process— The Insignificance of Foresight,* 70 YALE L.J. 554, 560–74 (1961).

Thus, we do not agree with the *Roginsky* court's premise that the availability of insurance against punitive damages awards would eliminate the deterrent effect of such awards. The question therefore becomes whether the prob-

lems outlined by Judge FRIENDLY in *Roginsky* outweigh the need for such deterrence.[14]

### (ii) *"Innocent Shareholders"*

The *Roginsky* court expressed the fear that if insurance against punitive damages liability were not available, "many innocent stockholders [might] suffer [ ] extinction of their investments for a single management sin." *Id.* at 841. We do not agree that shareholders of a corporation that has acted in reckless disregard of the rights of consumers are invariably "innocent," for through their selection of a board of directors, the shareholders have the power to select management.[15] Of course it may well be that some of the shareholders who feel the sting of a punitive damages award are "innocent" in that they were not shareholders at

**14.** Some opponents of the availability of punitive damages in products liability actions have argued that imposing liability without regard to fault is inconsistent with awarding punitive damages, which are predicated upon fault. However, as the District Court for the Northern District of Texas has observed, there is no inconsistency between an attempt to make compensation for injuries caused by defective products widely available by eliminating the requirement that the plaintiff show that the manufacturer was at fault, while at the same time deterring the distribution of defective products by the imposition of punitive damages:

> The basis of recovery for strict liability and exemplary damages is different. They are independent concepts. The purpose of one is compensation and the purpose of the other is deterrence. The focus of one is redistribution of loss and the focus of the other is punishment.... Because they are different concepts, their differences in premises and purposes are beside the point.

*Maxey v. Freightliner Corp., supra,* 450 F.Supp. at 961.

*See also Neal v. Carey Canadian Mines, Ltd., supra; Drake v. Wham-O Manufacturing Co., supra,* 373 F.Supp. 608, 611 (E.D.Wis.1974) ("Where the principal claim is based on strict liability in tort and there is an additional claim of wanton disregard of the plaintiff's rights, it is a simple matter to allow the plaintiff to make a supplementary showing of aggravating conduct for the purpose of proving entitlement to punitive damages"), *overruled on other grounds, Walbrun v. Berkel, Inc.,* 433 F.Supp. 384 (E.D.Wis.1976); *Sturm, Ruger & Co., Inc. v. Day, supra; Wangen v. Ford Motor Co., supra;* Owen, *supra. But see Butcher v. Robertshaw Controls Co.,* 550 F.Supp. 692 (D.Md.1981).

**15.** The power of shareholders to withdraw their investment may provide another means by which shareholders can influence management policies.

the time of the acts complained of or were shareholders at that time but had no way of knowing about those acts.[16] As to such shareholders, the punishment objective of punitive damage awards cannot apply. But the fact remains that it is the shareholders who will have the power to influence management policies, and the imposition of punitive damages will provide a powerful deterrent, both among shareholders of the company against which the award is imposed and among shareholders in other companies, against countenancing reckless business practices. The reason for holding shareholders accountable for corporate misconduct was well-stated in *Doralee Estates, Inc. v. Cities Service Oil Co.*, 569 F.2d 716, 722 (2d Cir.1977), in which Judge FRIENDLY joined:

> It is true that stockholders ultimately bear the cost of liability, but those who have been given authority to avert environmental damage should be given some incentive to do so. 'Smart money' is the traditional way, and the type of modern tort represented here is a fair field for punitive damages. . . .

*See also Goddard v. Grand Trunk Railway*, 57 Me. 202, 224 (1869) ("When it is thoroughly understood that it is not profitable to employ careless and indifferent agents, or reckless and insolent servants, better men will take their

---

**16.** It may also be that the shareholders who feel the sting of a punitive damages award are "innocent" in that they were shareholders at the time of the acts complained of and knew about those acts but attempted and failed to correct the problem. In most such cases, however, the shareholder could have withdrawn his investment before the award was made:

> We are not dissuaded from allowing punitive damages because this cost will ultimately be borne by "innocent" shareholders. Punitive damages are a risk that accompanies investment. . . . Investors may typically place their money where they choose and withdraw it when they wish. The prospect of ultimate liability for punitive damages may encourage investors to entrust their capital to the most responsible concerns.

*Moran v. Johns-Manville Sales Corp., supra*, 691 F.2d at 817.

*See also Pease v. Beech Aircraft Corp.*, 38 Cal.App.3d 450, 466, 113 Cal.Rptr. 416, 427 (1974) ("No sufficient reason appears why shareholders should be seen as captive innocent hostages to the inhuman management of a corporate juggernaut").

places, and not before"); *Wangen v. Ford Motor Co., supra.*

### (iii) *"Overkill"*

■ The District Court for the Northern District of California was quite correct in stating that the intention of punitive damages awards is "to sting, not kill, a defendant ...." [17] *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation*, .526 F.Supp. 887 (N.D.Cal.1981), *vacated on other grounds*, 693 F.2d 847, 899 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). But if the defendant's conduct was so reckless, and injured so many people, that the effect of the damages awarded against it is bankruptcy, we are hard-pressed to understand why that defendant should not be required to live with the consequences of its actions. We agree with the reasoning of the Illinois Court of Appeals in *Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 658, 63 Ill.Dec. 261, 264, 437 N.E.2d 910, 913 (1982):

> [W]e do not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous conduct, they have managed to seriously in-

17. Numerous procedures have been proposed in response to the fear of overkill expressed by Judge FRIENDLY in *Roginsky:* (1) should a punitive damages award be excessive, the court may grant a request for *remittitur, Neal v. Carey Canadian Mines, Ltd., supra; Campus Sweater and Sportswear Co. v. M.B. Kahn Construction Co., supra; Sturm, Ruger & Co., Inc. v. Day, supra; Rinker v. Ford Motor Co., supra, State ex rel. Young v. Crookham, supra; Wangen v. Ford Motor Co., supra;* (2) the court may instruct the jury that it may consider the defendant's past and potential future liability for punitive damages in fashioning a punitive damages award, *Unified School District No. 490 v. Celotex Corp., supra; Gryc v. Dayton-Hudson Corp., supra; State ex rel. Young v. Crookham, supra; Wangen v. Ford Motor Co., supra;* RESTATEMENT (SECOND) OF TORTS § 908 comment e (1979). *But see Roginsky v. Richardson-Merrell, supra*, 378 F.2d at 840 ("[W]hatever the result may be in strict theory, we think it somewhat unrealistic to expect a judge, say in New Mexico, to tell a jury that their fellow townsman should get very little by way of punitive damages because Toole in California and Roginsky and Mrs. Ostopowitz in New York had stripped that cupboard bare, even assuming the defendant would want such a charge, and still more unrealistic to expect that the jury would follow such an instruction or that, if they didn't, the judge would reduce the award below what had become the going rate").

jure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape *all* liability for punitive damages.

*See also State ex rel. Young v. Crookham, supra,* 290 Or. at 66, 618 P.2d at 1271 ("[F]inancial interests of the malicious and wanton wrongdoer must be considered in the context of societal concern for the injured and future protection of society"). Nor is it an answer to say that because a series of punitive damages awards may bankrupt a defendant, so that *some* future plaintiffs will be deprived of a damages recovery,[18] *all* plaintiffs should be foreclosed from recovering punitive damages. For the eventuality (bankruptcy) might never occur, in which case *all* plaintiffs would needlessly have been deprived of the option of obtaining punitive damages, and the objective of deterring reckless marketing practices would have needlessly been forgone.[19] *See Wangen v. Ford Motor Co., supra,* 97 Wis.2d at 291–92, 294 N.W.2d at 454 ("Ford would solve the inequity of awarding punitive damages to some plaintiffs by

**18.** While it has been argued that the possibility that "first-comers" may receive far larger punitive damages awards than later plaintiffs may not be as inequitable as it may seem, considering that earlier plaintiffs lay the groundwork for subsequent recoveries, *Wangen v. Ford Motor Co., supra;* Owen, *supra,* still, many courts have stressed the virtue of a single proceeding to assess a defendant's punitive damages liability to all plaintiffs, followed by an equitable division of the total award. *See Roginsky v. Richardson-Merrell, Inc., supra; In re Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir.) (HEANEY, J., dissenting), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); *Campus Sweater and Sportswear Co. v. M.B. Kahn Construction Co., supra; Froud v. Celotex Corp., supra; Unified School District No. 490 v. Celotex Corp., supra; State ex rel. Young v. Crookham, supra.*

**19.** Indeed, several courts have noted that the fears envisioned by the *Roginsky* court never materialized. *E.g., Campus Sweater and Sportswear Co. v. M.B. Kahn Construction Co., supra; State ex rel. Young v. Crookham, supra,* 290 Or. at 66, 618 P.2d at 1271 ("Hindsight demonstrates that the apprehension of the *Roginsky* court was heavily exaggerated. Of the 1,500 cases, in only three did juries award punitive damages. The vast majority of cases were settled and the financial destruction feared by the Second Circuit did not come to pass") (citations omitted).

having this court eliminate all punitive damages and by having us allow the wrong-doer to go unpunished"). Although we agree with the *Roginsky* court's observation that it is indeed unfortunate when a subsequent plaintiff is unable to obtain relief because the defendant's assets have been exhausted by prior verdicts, this possibility is neither unique to products liability actions nor sufficient to persuade us that defendants in products liability actions should enjoy a windfall while potential plaintiffs suffer the deprivation of a right to which they would otherwise be entitled.

We therefore conclude that the problems outlined by Judge FRIENDLY in *Roginsky* do not outweigh the needed deterrent effect that punitive damages may provide.

### b) *Punitive Damage Awards Against Successor Corporations*

Appellees urge, however, that we hold that punitive damages may not be awarded against Celotex Corp. for the conduct of Philip Carey Manufacturing Co., its predecessor, on the ground that "there is no policy reason to punish an innocent party with punitive damages." Brief for Appellees at 28.

We agree that in some circumstances it may make sense to permit only compensatory, and not punitive, damages to be awarded against a successor corporation. Suppose, for example, that a successor corporation manufactured the same line of products as were recklessly marketed by its predecessor, but shared neither shareholders, officers, directors, nor management personnel in common with its predecessor. It might be that the successor would nevertheless be liable for compensatory damages for the injuries caused by its predecessor, because it was in a better position to spread the cost of the loss than the injured consumers. *See Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 434 A.2d 106 (1981); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981). But it would make little if any sense to impose punitive damages on the successor, for the actors responsible for the predecessor's reckless misconduct—shareholders, officers, directors, and

management personnel—would neither be punished nor deterred from similar conduct by such an award. And if the successor had remedied the defect, there would be no conduct to deter, whereas if it had not, it would be liable in punitive damages for its own actions. Thus we agree with appellees to this extent—that it does not follow from the propriety of a compensatory award against a successor that punitive damages may also be imposed, even if the predecessor was reckless. *See In re Related Asbestos Cases,* 566 F.Supp. 818 at 822 (N.D.Cal.1983) ("The justifications underlying successor liability for compensatory damages articulated in *Ray v. Alad [Corp.,* 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977) ] simply are not present [when punitive damages are sought against successor corporation]").

We believe, however, that in some circumstances a successor should be held accountable for the recklessness of its predecessor. This will be so when the goals that underlie the imposition of punitive damages—punishment and deterrence—will be advanced. In this regard, we may draw from the various formulations of the rule permitting the imposition of successor liability when the successor is a mere "continuation" of its predecessor. *See generally Jacobs v. Lakewood Aircraft Service, Inc.,* 512 F.Supp. 176 (E.D.Pa.1981) (collecting cases); *Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136 (E.D.Mich.1979); *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797 (W.D.Mich.1974); *Kloberdanz v. Joy Manufacturing Co.,* 288 F.Supp. 817 (D.Colo.1968); *Wilson v. Fare Well Corp.,* 140 N.J.Super. 476, 356 A.2d 458 (1976); *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). We believe that when a legal change in corporate identity is not accompanied by major changes in the identity of the predecessor's shareholders, officers, directors, and management personnel, the imposition of punitive damages against the successor for the reckless conduct of the predecessor may be proper as advancing the goals of punishment and deterrence. For the actors responsible for the predecessor's reckless conduct will be punished and also deterred from

similar conduct in the future. The fact that the successor does not continue the product line recklessly marketed by the predecessor, or cures the defect, will not necessarily preclude punitive damages. For in either circumstance, the fact remains that those who are in control of the successor have demonstrated a willingness to act in reckless disregard of the rights of others.[20] That the public is now safe from · being injured by product x does not mean it is safe from the next reckless business practice these actors may undertake if not deterred.[21]

We therefore hold that punitive damages are recoverable against a successor corporation when the plaintiff has shown such a degree of identity of the successor with its predecessor as to justify the conclusion that those responsible for the reckless conduct of the predecessor will be punished, and the successor will be deterred from similar conduct.[22]

**20.** It does not follow that because a company has remedied a defect it is no longer willing to act recklessly. *See Moran v. Johns-Manville Sales Corp., supra* (Punitive damages imposed for reckless failure to warn of dangers associated with asbestos inhalation, despite fact that warnings were subsequently given); *Neal v. Carey Canadian Mines, supra* (same). *But see Drayton v. Jiffee Chemical Corp.,* 395 F.Supp. 1081 (N.D.Ohio 1975), *aff'd,* 591 F.2d 352 (6th Cir.1978), *disapproved in Moran v. Johns-Manville Sales Corp., supra.*

**21.** In this respect, it may be noted that the fact that a corporation has discontinued its reckless conduct by, *e.g.,* curing the defect, is no defense to the imposition of punitive damages. *See Moran v. Johns-Manville Sales Corp., supra Neal v. Carey Canadian Mines, Ltd., supra.* We see no reason why a successor corporation should be absolved of liability for punitive damages because of conduct not sufficient to absolve a predecessor corporation.

**22.** We do not attempt to state our holding more exactly, for we cannot foresee all of the possible configurations of facts that may arise. We do note, however, that quality, as well as quantity, may play a role in the analysis. For example, it might be appropriate to award punitive damages where a lesser number of shareholders, officers, directors, and management personnel continued in the successor but those who did were directly responsible for the egregious conduct of the predecessor, but not appropriate where a larger number of nonculpable individuals continued in the successor. *See Moe v. Transamerica Title Co.,* 21 Cal.App.3d 289, 98 Cal.Rptr. 547 (1971), *construed in In re*

### c) *Punitive Damages Awards Where Respectable Medical Opinion is Divided*

Appellees have also argued that the trial court's refusal to submit the issue of punitive damages to the jury was proper because at the time of appellant's exposure to asbestos, "medical and scientific authorities were in strong disagreement" as to the harmfulness of such exposure. Brief for Appellees at 25. The trial court justified its ruling on this basis. Thus it said: "We find that there was no evidence that the risk was fully realized by the defendants; even the scientific community did not appreciate the risk involved." Slip op. at 34.

Although we express no opinion as to whether the record supports the trial court's finding that "the scientific community did not appreciate the risk involved," we do disagree with the premise that unanimity among experts as to the hazards posed to insulation workers by asbestos exposure is a prerequisite to a finding that appellees acted recklessly in failing to warn of the health hazards that might be caused by exposure to asbestos. We believe, to the contrary, that evidence showing that appellees were aware of respectable medical authority to the effect that exposure to asbestos posed serious health hazards, and yet failed to warn potential users accordingly, might be sufficient to warrant submission of the issue of punitive damages to the jury, even if there was also evidence showing that appellees were simultaneously aware of respectable medical opinion to the contrary.

This view comports with decided cases. In *Moran v. Johns-Manville Sales Corp., supra,* the Court of Appeals for the Sixth Circuit upheld a punitive damages award, despite the fact that "[c]ross examination of ... witnesses [who testified that Johns-Manville was aware of risks to insulation workers well before it began to place warning labels on products] tended to show that causal connections between lung cancer and use of asbestos products were not

*Related Asbestos Cases, supra.* The issue of sufficient degree of identity is one that must be resolved on a case-by-case basis.

established with any certainty before Johns-Manville began using warning labels." *Id.* at 814. *See also Evans v. Philadelphia Transportation Co.,* 418 Pa. 567, 212 A.2d 440 (1965) (Although defendant could not tell with certainty whether the object he saw lying on the train tracks was a person, his failure to take precaution against possibility that object was a person by stopping the train was reckless). In *Moran* the court held that despite evidence that medical opinion regarding the effects of asbestos exposure was not unanimous, the jury could properly have found on the basis of appellant's awareness of medical opinion that asbestos exposure could cause "chronic debilitating diseases," and that when combined with the fact that "the placement of warning labels on insulation products" would not have been "onerous," appellant's "indifference to consumers' risks [had been] 'flagrant.'" *Id.* at 816. Also to be noted is Section 908(2) of the RESTATEMENT (SECOND) OF TORTS (1979), which provides:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

The failure to take precautions urged by respectable medical authority, even when medical opinion is not unanimous, may be evidence of "reckless indifference to the rights of others," pertinent to an appraisal of "the character of the defendant's act."

Accordingly, we hold that the introduction on remand of evidence that respectable medical authority was divided on the effects upon insulation workers of asbestos exposure at the time of appellant's exposure will not necessarily preclude the submission of the issue of punitive damages to the jury.

—4—

■ Appellant also argues that the trial court erred in refusing to permit some eight to nine hundred Industrial Health Foundation abstracts of articles about the connection between asbestos exposure and asbestosis to be either introduced or read into evidence. The court ruled that "admission of the file of abstracts would have been confusing to the jury." Slip op. at 30. We note, however, that the court also ruled that Jane Brislin, the Director of Informational Services of the Industrial Health Foundation, could

> testify to the number of abstracts, according to the year in which the abstracts were disseminated, the number of articles which indicated that there were health risks associated with asbestos, and that the abstracts were routinely distributed to the members of the Foundation. [T., Vol. I, p. 225]

Slip op. at 28.

Appellant concedes that Brislin was permitted to testify that three of the defendants were members of the Foundation. Brief for Appellant at 37. For the purpose of giving guidance on remand, we hold that the trial court's ruling was a proper exercise of its broad discretion to exclude merely cumulative evidence, likely to confuse the jury and result in undue delay. *See Whistler Sportswear, Inc. v. Rullo*, 289 Pa.Super. 230, 433 A.2d 40 (1981); McCORMICK ON EVIDENCE § 185 (2d ed. 1972); 1 & 2 WIGMORE, WIGMORE ON EVIDENCE §§ 29a, 443 (Chadbourn rev. 1979).

—5—

Cross-appellant, Combustion Engineering, Inc., argues that the trial court erred in denying its motion for judgment n.o.v.

■ It is well-settled that "[i]n reviewing an order denying judgment n.o.v., we must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to appellee as the verdict winner." *McCloskey v. New York Life Insurance Co.*, 292 Pa.Super. 1, 5, 436 A.2d

690, 691 (1981). *See also Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100 (1980). Appellant testified that in 1953 and on another occasion prior to 1957 he used Combustion Engineering pipe covering block and cement. In addition, the record discloses that Combustion Engineering manufactured insulating block prior to 1957 and insulating cement prior to 1953. N.T. vol. 1 at 335; vol. 2 at 537–38; vol. 7 at 103–04. This evidence was ample to warrant the trial court's denial of cross-appellant's motion for judgment n.o.v.[23]

–6–

 Cross-appellant has also argued that the trial court erred in granting Raybestos-Manhattan's motion for a directed verdict. Raybestos-Manhattan argues that cross-appellant has waived this argument by failing to object to Raybestos' motion.

Our review of the record discloses that none of the defendants objected, either after the motion for a directed verdict was made, N.T. vol. 8 at 168–97, or after it was granted, N.T. vol. 8 at 197–268, vols. 9, 10.[24] It is well-settled that an objection to a ruling of the trial court will be preserved for appellate review only if made in a timely fashion. *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975); *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 257, 322 A.2d 114, 116 (1974). The reason for this rule is

23. The fact that appellant's counsel read into the record cross-appellant's response to an interrogatory, to the effect that cross-appellant did not begin to manufacture products containing asbestos or asbestos components until 1963, does not undermine the further fact that other evidence—much of which was also provided in cross-appellant's responses to interrogatories—permits the inference that appellant was exposed to asbestos products manufactured by cross-appellant prior to 1957, indeed, as early as 1953.

24. A statement by counsel for Unarco, which has been severed from this appeal, that he wanted to make sure that the court's dismissal of appellees' cross-claims would not forfeit his right to appeal the dismissal of Raybestos "*if* [he] want[ed] to," N.T. vol. 8 at 209 (emphasis added), was made after the court's ruling and in a different context, and was not sufficient to alert the court that Unarco objected to the ruling.

that "[f]ailure to interpose a timely objection at trial denies the trial court the chance to hear argument on the issue and an opportunity to correct the error." Where, as here, an objection to a motion for a directed verdict is not made until the jury has been discharged, the objection is not timely, for by then it is too late for the issue of the defendant's liability to be submitted to the jury. To permit an objection at that stage would thus be at odds with "the orderly and efficient use of judicial ... resources." *Id.*, 457 Pa. at 258–59, 322 A.2d at 116. We therefore hold that cross-appellant's argument is waived.

On the appeal of Joseph Edward Martin: we reverse and remand for a new trial limited to the issue of damages, consistent with this opinion.

On the cross-appeal of Combustion Engineering, Inc.: we affirm.

CAVANAUGH, J., files a concurring and dissenting opinion.

WIEAND, J., files a concurring and dissenting opinion, in which HESTER, J., joins.

CAVANAUGH, Judge, concurring and dissenting:

I concur with the majority opinion except for part 3 relating to punitive damages. For the reasons set forth in Part IV of Judge Friendly's opinion in *Roginsky v. Richardson-Merrell*, 378 F.2d 832 (2d Cir.1967) I would hold that there should be no right to seek punitive damages under Pennsylvania law in cases where claim is made for compensatory damages as a result of injury or death caused by exposure to asbestos products.

The enormity of the asbestos related disease problem is one of national scope. As of 1982, there were over one thousand eight hundred and fifty claims which seek damages as a result of asbestos product exposure in the Philadelphia Court of Common Pleas and new cases were being filed at the rate of seventy-five per month. The number of

cases nationwide were over sixteen thousand.[1] It has been estimated by the United States Department of Labor that thousands of persons will become disabled or die from asbestos related disease each year until well into the next century. The problem is compounded by the fact that the physical impairment resulting from asbestos exposure often does not exhibit itself until twenty to thirty years after the exposure.[2] As a result of these claims, several implicated defendants have declared bankruptcy and others have exhausted their insurance liability coverage.

Faced with this complex social problem and in the absence of legislative or executive solutions, the courts cannot simply react to the problem in the isolation of its traditional case-by-case methodology. While the judges of our state courts are in the midst of examining this problem,[3] our decisional law in the meantime cannot ignore the economic impact of current declarations. To permit the award of punitive damages is, in my opinion, counterproductive to the just goal of best providing that reparations are most fairly awarded to all of the present and future claimants who can demonstrate compensable injury or disease. The right to pursue an award of punitive damages in these cases will further clog the trial courts since we cannot suppose that defendants will voluntarily pay a sum as punitive damages, nor could we blame injured plaintiffs who, once the right to punitive damages is established, insist on a trial in order to assert their claim. Thus, one result may be more trials and fewer settlements. More importantly, faced with evidence that the industry's resources may not be sufficient to satisfy just claims for compensatory damages by all who have or will suffer injury or disease, it seems an unfair allocation of limited resources to permit those who first find their way

1. *See Pittsburgh Corning Corp. v. Bradley,* 499 Pa. 291, 294, 453 A.2d 314, 315 (1982).

2. *Ibid.,* 499 Pa. at 294, 453 A.2d at 314.

3. Justice Roberts of our Supreme Court is chair of a committee sponsored by the National Center for State Courts which is denominated the "Judicial Working Group on Asbestos Litigation."

through the crowded turnstiles to obtain a monetary prize to the detriment of others down the line who may find the well of compensation dry.

WIEAND, Judge, concurring and dissenting:

I agree with the majority that the trial court·erred when it excluded any evidence of cancer and that this error requires a new trial.

I am also in agreement that there is no per se rule which precludes the recovery of punitive damages in a products liability case. See: Annot., 13 A.L.R.4th 52 (1982). In this case, the trial court did not hold otherwise. It held, rather, that the evidence was insufficient to submit the issue of punitive damages to the jury.

An award of punitive damages is an extreme remedy. Although nominally civil, a claim for punitive damages is not intended to compensate the plaintiff but to punish a defendant and deter him from flagrant and outrageous misconduct. In order to establish a right to recover punitive damages, a plaintiff must prove that a defendant has been guilty of outrageous conduct, "that is, ... acts done with a bad motive or with a reckless indifference to the interests of others." *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963), quoting Restatement of Torts § 908(1) comment b. The consequences of imposing punitive damages, as the majority recognizes, are serious. They include an implied stigma greater than that which attaches to an award of compensation and which is similar to, if not the same as, a criminal conviction. Moreover, there is inherent in an award of punitive damages a substantial risk of error, for there are no adequate guidelines and the award is dependent almost wholly upon the discretion of inexperienced jurors who are not limited in any way with respect to the amount of punitive damages which they can assess.

Because " 'the consequences of imposing punitive damages in a case like the present are so serious' ...[,] 'particularly careful scrutiny' is warranted." *Acosta v. Honda*

*Motor Co.,* 717 F.2d 828, 839 (3d Cir.1983), quoting *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 852 (2d Cir.1967). Therefore, I would hold that in an action where liability is predicated upon Section 402A of the Restatement (Second) of Torts, a plaintiff seeking punitive damages must prove the requisite "outrageous" conduct of a defendant by evidence that is clear and convincing.[1] See: *Acosta v. Honda Motor Co., supra; Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980). See also: Wheeler, "The Constitutional Case for Reforming Punitive Damages Procedures," 69 Va.L.Rev. 269, 296–298 (1983).

Applying this standard to the evidence in the instant case, it seems clear that plaintiff failed to produce evidence sufficient to show that any of the defendants had been guilty of outrageous conduct. Therefore, the trial court properly refused to submit the issue of punitive damages to the jury.

For the foregoing reasons, I would limit the award of a new trial to the issue of compensatory damages only.

HESTER, J., joins.

---

1. The use of a different standard of proof will most likely compel bifurcation. A jury would be permitted to hear and decide punitive damage issues only after it had rendered a verdict on liability and compensatory damages.